Todd Blanche
Attorney General of the United States
Ann T. Wick
Assistant United States Attorney
Eastern District of Washington
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NICHOLAS MICHAEL HOWARD<br><br>Defendant. | Case No.: 2:25-CR-0102-RLP<br><br>United States' Sentencing Memorandum |

Plaintiff, United States of America, by and through Ann T. Wick, Assistant United States Attorney for the Eastern District of Washington, submits this memorandum setting forth the government's position at sentencing. In accordance with the terms of the Rule 11(c)(1)(C) Plea Agreement, ECF No. 60, the United States recommends that the Court sentence Defendant to a term of imprisonment of 210 months in custody, to be followed by a ten-year term of Supervised Release. The United States also requests imposition of a $5,000 special assessment under both the Justice for Victims of Trafficking Act (JVTA) and AVAA and restitution in the

total amount of $44,000, which total must include a mandatory minimum amount of $3,000 to each of the seven victims who have requested restitution.

## INTRODUCTION

Like many sex offenders, particularly those with a sexual interest in minor children, Defendant is a gifted manipulator. For twenty years he hid his sexual interest in minors from those closest to him. During that time, he married, had children, and regularly went to work and church. He successfully hid his true self from those people in his everyday life and, instead, turned to online forums full of deviant sex offenders who shared his sexual interests, which include minor children, incest, rape, bondage, strangulation, and violence. It was online – particularly the Dark Web, that Defendant was his true self. It was there that Defendant spoke of his interest in minors as young as six years old. It was there that Defendant admitted to being aroused when discussing "the birds and the bees" with his then 9-year-old daughter. It was there that Defendant said he would like to have sex with a young friend of his then 11-year-old daughter. And it was there that Defendant encouraged others to sexually abuse and exploit other minor children. Certainly, if his wife, parents, colleagues, or anyone who has offered a character letter on Defendant's behalf, knew what awfulness lurked below the surface, they would not have stood idly by, much less allowed him unfettered access to minor children.

Defendant's manipulation, however, extends farther than hiding his sexual interests. Even now, Defendant continues to play fast and loose with the truth. For example, he led United States Probation to believe that no protection order exists as to his wife and daughters. ECF No. 68 at ¶ 64. A protection order does nevertheless continue to exist, albeit under a different case number under the original order. *See* United States Exhibit No. 4 (certified copy of Restraining Order filed March 20, 2026, in Spokane County Case No 25-3-01946-32, which appears to still be current per online court records). He tried to hide a 401(k) account, only disclosing the $70,000 asset upon a "follow-up question" during the presentence investigation interview (PSR ¶ 75) and failing to disclose it altogether on the financial disclosure form he was required to complete as part of the plea agreement. ECF No. 60 at 25-26.

Another example of Defendant's manipulation and dishonesty is in what he has said at different times about his marital affairs. He stated in a Declaration[1] in Spokane County Case No. 25-2-03054-32 (Page 5, line 7) that he never slept with the woman that his wife was alleging he cheated with. He reported in a psychosexual assessment, however, that he had sex on three occasions with a woman he met

[1] The United States is in the process of obtaining a hard copy of this document. It is currently available to the public online.

online, identifying this woman as his affair partner. *See* United States Exhibit No. 6 (psychosexual assessment) at 11.[2]

As discussed herein, this continued manipulation and deception bears strongly on Defendant's likelihood of reoffending, whether it is online exploitation, or – more alarming – in person. It certainly supports a sentence in line with the Sentencing Guidelines, which take into account empirical data and the documented dangerousness of sex offenders like Defendant, and are intended to serve a goal of consistency in sentencing. The United States's recommended sentence is consistent with the intent of the Guidelines and the goals of sentencing found in 18 U.S.C. § 3553.

**PROCEDURAL POSTURE**

If the Court accepts the Rule 11(c)(1)(C) Plea Agreement, the Court must sentence Defendant to a prison term of no less than 60 months, up to 210 months.[3] ECF No. 60. The Court must impose a term of supervised release of not less than five years, up to life. 18 U.S.C. § 3583(k).

[2] The United States intends to file this exhibit as soon as practicable, under seal.

[3] The Rule 11 nature of the plea agreement requires a sentence of not less than 60 months and not more than the low end of the advisory guideline range as calculated by the United States. ECF No. 60 at 5-6. The United States agrees with the calculation of the guideline range as reflected in the final PSR, ECF No. 68, which results in a low-end of 210 months. PSR ¶ 79.

Defendant stipulates that he is not indigent for purposes of the mandatory JVTA special assessment. ECF No. 60 at 22-23. Therefore, Defendant's sentence must include the $5,000 special assessment under the JVTA. The United States recommends an AVAA assessment of the same amount.

Defendant has agreed to pay restitution of not less than $3,000 to each victim depicted in the child pornography Defendant distributed, received, and/or possessed. ECF No. 61 at 16(a). A total of $44,000 has been requested by seven victims of Defendant.

The United States agrees with the procedural history and offense conduct detailed in paragraphs 1-22 of the Presentence Investigation Report (hereinafter "PSR"). ECF No. 68. Defendant has objected to application of a four-level increase under U.S.S.G. §2G2.1(b)(4). ECF No. 65. For the reasons discussed herein, the Court should overrule Defendant's objection.

## **LEGAL ANALYSIS**

The Ninth Circuit has set forth a basic framework which the district courts should follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts are to begin all sentencing proceedings by correctly determining the applicable sentencing guidelines range, precisely as they would have before *Booker*.
>
> (2) Courts should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties. Courts may not presume

> that the guidelines range is reasonable. Nor should the guidelines factors be given more or less weight than any other. They are simply to be treated as one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.
>
> (3) If a court decides that a sentence outside the guidelines is warranted, then it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.
>
> (4) Courts must explain the selected sentence sufficiently to permit meaningful appellate review.

*United States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008).

## SENTENCING CALCULATION AND IMPOSITION OF SENTENCE

### I. United States Sentencing Guidelines Calculation

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

#### A. Offense Level Calculation

The final Presentence Investigation Report correctly calculated the defendant's total offense level as 37, including a four-level enhancement for Defendant's having possessed images and videos depicting sexual abuse and exploitation of a toddler, as well as other sadistic or masochistic conduct. PSR at ¶ 40. Defendant objected to the enhancement on the grounds that "these additional points were never discussed between the parties in the plea negotiations and are not included in the plea agreement." ECF No. 65 at 1. Defendant further asserted that

U.S.S.G. §2G2.2(b)(4) is "unconstitutional and inappropriate because it is contrary to the elements of the offense which requires the knowing receipt of child pornography." *Id*. Defendant's objection is unsupported, contrary to precedent, and should be overruled.

First, whether or not the parties agreed to the enhancement at issue in the plea agreement, or even discussed it, is irrelevant. The Plea Agreement specifically states that the advisory guideline range will be determined after a presentence report is prepared. ECF NO. 60 at 10. The Plea Agreement further states that the United States' estimate of Defendant's total offense level is "not binding on the United States, the Court, or United States Probation." *Id*. n.1. The Plea Agreement also reflects that the parties "make no agreement about the applicability of any other specific offense characteristic adjustment." *Id*. at 11. Moreover, the Court has an independent obligation to correctly calculate the advisory guideline range as set forth above. *Carty*, 520 F.3d at 991-92.

The Sentencing Guidelines provide for a four-level enhancement where "the offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) sexual abuse or exploitation of an infant or toddler." U.S.S.G. §2G2.2(b)(4). Defendant does not contest that material in his collection

depicts sadistic or masochistic conduct, other depictions of violence, or the sexual abuse or exploitation of an infant or toddler.[4]

Rather, Defendant appears to contend that the enhancement cannot be applied without proof of a knowing mens rea, as with the receipt crime to which he pleaded guilty. ECF No. 65 at 2. This argument has been raised and rejected by the courts; and like others who have gone before, Defendant's "faulty legal interpretation dooms his argument." *United States v. Ellison*, 113 F.3d 77, 82 (7th Cir. 1997) (holding enhancement can be applied "when the relevant conduct evinces sadomasochistic images but the actual image under which the defendant is charged does not"); *see also United States v. Meschino*, 643 F.3d 1025 (7th Cir. 2011) (affirming application of the enhancement "regardless of whether the defendant specifically intended to possess, access with intent to view, receive, or distribute

---

[4] Even if Defendant did contest the substance of the material in question, such contest would be without any merit. Defendant's collection of sexually explicit material included at least one depiction of a toddler being anally raped by an adult male, which courts have repeatedly held constitutes sadistic conduct, even when the victim is older than toddler-age. *See Rearden*, 349 F.3d 608, 614-16 (9th Cir. 2003) (collecting cases); *United States v. Bender,* 290 F.3d 1279, 1285–86 (11th Cir.2002) (holding that photographs of adult males vaginally and anally penetrating young children depicted "the subjection of a young child to a sexual act that would have to be painful," and thus were sadistic images) (internal quotation marks omitted). Additionally, Defendant possessed other videos in which the minor victim was protesting and otherwise displaying pain, which courts have said is not required to find sadistic conduct. *Rearden*, at 614-16 (rejecting argument that the enhancement required and indication that the child victim experienced pain).

such materials"); *United States v. Barevich*, 445 F.3d 956, 958–59 (7th Cir. 2006) (possession of sadomasochistic child pornography was properly included as uncharged but relevant conduct for the charged offense of transporting child pornography).

Even if precedent specific to child pornography cases was wholly absent, the Ninth Circuit has consistently declined to read scienter language into sentencing enhancements which do not require proof of mens rea. *See, e.g., United States v. Rodriguez*, 162 F.4th 1016 (9th Cir. 2025) (declining to impute elements of "knowingly" and "with intent to defraud" into enhancement for possession of authentication features); *United States v. Gonzalez*, 262 F.3d 867, 870 (9th Cir. 2001) (rejecting argument that the mens rea requirement for criminal offenses generally should be applied to the Sentencing Guidelines and declining to require knowledge of age in an enhancement for use of a minor to commit the offense); *United States v. Lavender*, 224 F.3d 939, 941 (9th Cir. 2000) (declining to require "intent to use [] as [a] weapon[]" in enhancement for possession of dangerous weapon) ("Sentencing factors, however, are not separate criminal offenses and as such are not normally required to carry their own mens rea requirements.").

Although a fraud case, *Rodriguez* is highly persuasive precedent in favor of application of §2G2.2(b)(4) in this case, given the comparable enhancement language, comparable factual circumstances, and nearly identical arguments by the

defendant. In *Rodriguez*, the defendant was convicted of possession of at least 15 unauthorized access devices under 18 U.S.C. § 1029(a)(3). 162 F.4th at 1018. The district court applied a four-level sentencing enhancement under U.S.S.G. §2B1.1(b)(11)(A)(ii), which increases a defendant's offense level if "the offense involved [ ] the possession or use of any ... authentication feature," on the basis of two driver's licenses found among 140 pieces of stolen mail in Rodriguez's backpack and bag. *Id*. at 1018-1019. The defendant objected and asserted that the phrase "offense involved" imputes the elements of the offense of conviction, thereby requiring proof that she "knowingly possessed the authentication features with the intent to defraud" in order to apply the enhancement. *Id*.

The Ninth Circuit rejected Rodriquez's arguments, held that §2B1.1(b)(11)(A)(ii) does not include a mens rea requirement, and affirmed the district court. 162 F.4th at 1021. The Court looked first at the text of the Sentencing Guidelines and found that §2B1.1(b)(11)(A) does not include a mens rea requirement on its face. *Id*. at 1019-1020. This was noteworthy, since another enhancement under §2B1.1 did require intent, demonstrating that the Sentencing Commission knew it was capable of including a scienter requirement in the authentication feature enhancement had it so wanted. *Id*. at 1020.

The Court further walked through the definitions of: a) "offense," as "the offense of conviction *and* all relevant conduct;" b) "relevant conduct," as "all acts

and omissions committed ... by the defendant ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection ... for that offense;" and c) "involved," as an expansive term that "should be defined broadly," . . . to mean "to relate to or affect." 162 F.4th at 1020 (internal citations and quotations omitted). The Court then held that "[p]aired together, 'offense involved' is just as broad: it refers to both the offense of conviction and lesser acts that, while related to the crime committed, do not necessarily carry all the elements required to sustain a conviction. *Id*. (citing *Lavender*, 224 F.3d at 941).

As in *Rodriguez*, the enhancement at issue applies when the "offense involved" sadistic, masochistic, or violent material, or sexual abuse or exploitation of a toddler. U.S.S.G. §2G2.2(b)(4). As in *Rodriguez*, the evidence upon which the enhancement was applied was found within the larger body of evidence (Defendant's child pornography collection) establishing the defendant's offense of conviction. As in *Rodriguez*, Defendant Howard asserts that the scienter element of his offense of conviction should be imputed to the enhancement. ECF No. 65 at 2. Thus, as in *Rodriguez*, and following the other precedent cited herein, this Court should overrule Defendant's objection and apply the four-level enhancement of §2G2.2(b)(4).

B. Criminal History Calculation

The PSR correctly calculated the defendant's criminal history category as Category I. PSR ¶ 57.

C. Advisory Guideline Range

Based upon a total offense level of 37 and a criminal history category of I, the advisory guideline imprisonment range is 210 - 262 months. PSR ¶ 79.

## II. Departures

The United States does not recommend a departure from the advisory guideline range. Neither are there any bases identified in the PSR that warrant a departure. PSR ¶ 97.

## III. Imposition of a Sentence under 18 U.S.C. § 3553

A. 18 U.S.C. § 3553(a) factors

1. The nature and circumstances of the offense

The nature and circumstances of Defendant's offense warrant a sentence of to a term of imprisonment of 210 months in custody followed by a ten-year term of supervised release. Defendant and his crimes were discovered as a result of Defendant's participation as a "senior member" on a vile website dedicated to child pornography. PSR ¶¶ 11-12. The Federal Bureau of Investigation reviewed approximately 179 of Defendant's posts, wherein Defendant communicated with

other users sharing a sexual interest in minor children and requested and traded images of child sexual abuse material. PSR ¶¶ 12, 19.

The content and nature of Defendant's activity on the site is revealing: Defendant spoke of his "attraction to minors aged 7–14 years old with an affinity for red hair and freckles." PSR ¶ 12. He posted that "became sexually aroused when explaining sex to his then nine-year old daughter, that he understood the appeal of being sexually active with a minor female and that he fantasized about this for decades." *Id*. Defendant also shared that he "masturbated to minor females he knows or comes across in real life," that he "followed multiple minor aged females on Instagram to whom he masturbates to," and that "he would engage in sexual intercourse with his older [11 years of age] daughter's friend if he could." *Id*. He appreciated that the website was "truly full of [his] people." *Id*.

When law enforcement executed the search warrant leading to the discovery of child pornography on Defendant's devices, Defendant had just minutes before left his wife and daughter's residence in his vehicle with his two minor daughters in the backseat. *See* PSR ¶ 14.

Defendant's child pornography collection on the date of seizure was found to contain at least 223 images and 23 videos of child pornography. PSR ¶ 15. On Defendant's phone, the FBI identified four videos that had been accessed approximately 10 minutes before Defendant's arrest. *Id*. The videos included both

male and female minors engaging in oral, anal, and vaginal penetration with a penis. *Id*.

The totality of material viewed in Defendant's child pornography collection was extensive and heinous. Defendant had content of toddlers being abused: one video shows an adult "grip[ping] the toddler's arm and us[ing] it to repeatedly penetrate a female's vagina." PSR ¶ 15. Another video shows a toddler being held down while and adult male "repeatedly forces his penis into the toddler's anus." *Id*. Besides toddlers, the videos and images depicted male and female children of prepubescent age. *Id*.

On the day of Defendant's arrest, he distributed a video depicting an adult male digitally penetrating a nude pre-pubescent female. PSR ¶ 16. On this day, Defendant also received a video in which multiple males are urinating on nude, pre-pubescent females, one of whom is bound to a platform. *Id*.

Another video Defendant possessed depicts a female child aged 14-16 being vaginally penetrated by a male despite her protests. *Id*. Yet another video obtained by Defendant depicted a young teenage female, nude, with no breast development or pubic hair, lying on her back being penetrated by two men, simultaneously orally and either vaginally or anally, while her face grimaces in pain. PSR ¶ 17.

Defendant's possession of sadistic and masochistic pornography was not limited to minors; he also possessed adult pornography depicting acts of violence. PSR ¶ 18. One video included two naked women being hung by their neck while another video depicted a woman with her hands behind her back being strangled from behind with a rope as she "struggles in anguish." *Id.*

The forensic review of Defendant's devices further revealed that, after 20 years of seeking out, exchanging, and collecting child pornography, Defendant was experienced in taking steps to conceal his prurient interests and avoid detection for his crimes. He used anti-forensic software such as ShredIt and Bleachbit, demonstrating criminal thinking, not just a sexual interest in minors he could not suppress. PSR ¶ 21. A sentence at the low end of the guideline range is warranted, as is a term of supervised release longer than the mandatory minimum of five years.

2. <u>The history and characteristics of the defendant</u>

Defendant's history and characteristics support a 210-month term of prison followed by a 10-year term of supervised release. While not overt, Defendant has shown a pattern of behavior that is anti-social and secretive. He exhibits characteristics that support the notion that he does not respect the Court or the law, nor does he show any indication that he expects his behaviors will be met with actual consequences. All of these characteristics contribute to a likelihood of

reoffense and further demonstrate that Defendant, behind the mask, is a danger to the community.

a. Personal characteristics

Defendant has been hiding his core self for many years – at least 20 years, using manipulation and deceit. Because of the FBI's investigation, a light is shining on what Defendant concealed all those years. Defendant had videos of Nazi ideology, incest related pornography, pornography involving severe violence and either death or near death, in addition to an abundance of Child Sexual Abuse Material (CSAM). All this despite professing throughout this case to be deeply religious since his teens, never missing Catholic mass, regularly participating in the sacrament of Confession, and volunteering at the church. *See, e.g.,* ECF No. 16 (letters in support); *see also* Declaration of Nicholas Howard, Spokane County Case No. 25-2-03054-32, at 4 (stating that he had given his wife the rules of the Catholic Church before they were married, as it was imperative to him that she respected the rules of his faith).

According to the psychosexual assessment provided by Defendant, Defendant has verbally taken responsibility for his conduct, portraying feelings of shame and regret. Ex. 6 at 9. Likewise, the PSR reflects that Defendant was "candid" during the presentence interview, "taking full responsibility for his actions." PSR ¶ 34. The United States respectfully submits, however, that Mr.

Howard knows the right words to say and that saying them is in his best interest. This is not the same as feeling and exhibiting genuine remorse for the harm he has caused his victims. Every time Defendant viewed or exchanged CSAM, he was doing harm and perpetuating a terrible market of pain and filth. Defendant's shame and regret appears to be more about his getting caught and the predicament in which he now finds himself and less about his more than 45 identified victims and others harmed by his actions.

Defendant's account of his offense is misleading at best. While he posted online that he is attracted to minors as young as six years (ECF No. 60 at 8), he told the psychosexual evaluator that he viewed "female images ranging in age from eight to sixteen or seventeen" further explaining that he would "get whatever he could find and then eventually focused on eight and above." Ex. 6 at 1, 10. To the contrary, the FBI recovered multiple videos of children around the age of four to six, and some as young as toddlers. PSR ¶ 15. To speak plainly, if one professes to be, and is, a Ford man, one does not then find a garage full of Chevy trucks.

Again despite what Defendant posted online – for years – Defendant reports that he is only sexually interested in adult women, not minor children, while also painting himself as "asexual." Ex. 6 at 1. He indicates beginning to use CSAM only after viewing adult pornography in excess and looking for new and different material. *Id*. at 2. Furthering the excuse, Defendant adds that during the times he

viewed CSAM, he was isolated and got validation through connection with children. *Id*. If Defendant is to be believed, he viewed CSAM from 2001 until 2008 and again from 2017 until his indictment on the present charges. *Id*. at 10. Defendant's conduct was far from a one-time thing; he didn't realize his mistake and stop. He continued viewing, trading, and connecting with others about CSAM for well over a decade.

Telling the truth is difficult for Defendant. It is lies and secrets that make manipulation possible. During Defendant's PSR and psychosexual assessment interviews, he provided the answers he probably thought were "right," instead of the truth. This guarded and defensive behavior led the evaluator to conclude that Defendant was in denial about his sexual interests. Ex. 6 at 6. Defendant told United States Probation that his wife got a restraining order against him which was quickly terminated. PSR ¶64. While that was technically true, he conveniently failed to include the fact that there is an active restraining order that protects his wife and their children from him under another case number. Ex. 4.

During the hearing for the first protection order, Defendant stated in his Declaration that he never slept with the woman with whom his wife was alleging he cheated. *See* Declaration of Nicholas Howard, Spokane County Case No. 25-2-03054-32, at 5. At the time, he likely believed it would benefit him to refute his wife's allegations to the court. In his psychosexual assessment, however, when he

likely thought examples of sex with adult women were to his benefit, he reported having sex on three occasions with a woman he met online, identifying this woman as the one with whom he cheated on his wife, and further disclosed a male affair partner. Ex. 6 at 11.

Additionally, during Defendant's psychosexual assessment, he described his relationship with his wife as having challenges early on; identifying her alleged reduced libido led to constant rejection of him and eventually a sexless marriage, ripe with resentment. Ex. 6 at 3. Defendant placed much of the blame on his wife, noting "controlling behaviors on her part . . . she made all the decisions for the children, and he had very little say in their marriage and their family." *Id*. Defendant failed to share, however, that while his wife's libido was reduced and she sought birth control against his wishes, she was battling breast cancer and grieving the loss of her father. *See* United States Exhibit No. 2, Petition for Protection Order, Spokane County Case No. 25-2-03054-32.

Finally, at the plea hearing in July, Defendant and his mother expressed the need for him to be home for as long as possible due to his father having Alzheimer's Disease, stating it is unknown how long his father will live. It turns out, Defendant's father only *might* have the early stages of Alzheimer's. PSR ¶ 62. What is for sure, albeit still according to Defendant, is that Defendant's father has been an alcoholic for as long as Defendant can remember and struggles with his hearing. *Id*. Like any

man, Defendant is only as good as his word; and it is clear that Defendant will stretch the truth when and to whatever degree he thinks will best serve him.

b. Internet Sex Screening Test

The psychosexual assessment of Defendant included use of the "Internet Sex Screening Test" (ISST). Ex. 6 at 1. The report, however, did not include the results. In additional materials obtained from the evaluator, the results of the ISST suggest that Defendant is at "the highest risk" level identified by the ISST.

According to the American Psychological Association, this test "is a self-administered screening instrument to help individuals determine if their internet sexual behavior has become clinically problematic."[5] The ISST assesses components of addiction including: "salience, impaired control, withdrawal, tolerance, mood modification, intrapsychic conflict, financial conflict, general life conflict, sleep conflict, and deception."[6]

To score this test, the directions indicate tallying questions one to twenty-five; a score of one to eight means "you may or may not have a problem with your sexual behavior on the internet," a score of nine to eighteen means "you are at-risk for your sexual behavior to interfere with significant areas of your life," and a

[5] *APA Psyc Tests: Citation and Description Internet Sex Screening Test*, APA PsycNet Direct, https://psycnet.apa.org/doiLanding?doi=10.1037%2Ft60529-000.

[6] D.L. Delmonico & J.A. Miller, The Internet sex screening test: A comparison of sexual compulsives versus non-sexual compulsives, 18 Sexual and Relationship Therapy 261 (2003).

score of nineteen or more means "you are at highest risk for your behavior to interfere and jeopardize important areas of your life."[7] The score for questions twenty-six to thirty-four is an abbreviated version of the Sexual Addiction Screening Test.[8] The scoring directions further explain "a high score on items [one] through [twenty-five] paired with a high number of items in [twenty-six] through [thirty-four] should be seen as an even greater risk for sexual acting out behavior on the internet."[9]

The additional materials obtained from evaluator indicated that Defendant's score was 16 on the first part and seven on the second part. However, defendant did not select "9. I have a sexualized username or nickname that I use on the Internet" or "15. I use the Internet to experiment with different aspects of sexuality (e.g. bondage, homosexuality, anal sex, etc.)." According to the evidence recovered by the FBI, Defendant's username on one platform included the term "strokes" and on another platform it was "Vaginus," likely combining the words vagina and anus. Additionally, Defendant shared that he had explored new things when adult pornography became not enough to address his needs. Ex. 6 at 2. The evidence supports this, both in his admission of having a sexual experience with a man on two occasions, and the various videos of women and children being held

[7] *Id.*
[8] *Id.*
[9] *Id.*

down or tied up and children being forced to endure anal sex on Defendant's devices. Ex. 6 at 11; PSR ¶ 15, 18. With that, it is more likely that Defendant's score on part one of the ISST is 19, making his total score 26.

Based on Defendant's responses and the evidence-supported increase outlined above, Defendant scores in the highest category for part one. He is at "the highest risk" and the tool suggests individuals in this category "discuss [their] online sexual behaviors with a professional who can further assess and assist,"[10] Since Defendant also scored a seven out of nine on part two of the ISST, he is considered "an even greater risk for sexual acting out behavior on the Internet."[11]

c. Mental Health Impacts

Certain mental health concerns raise red flags regarding Defendant's dangerous and risk of reoffense. Along with meeting diagnostic criteria for Pedophilic Disorder, which "has been shown to be a strong predictor of sexual recidivism,"[12] Defendant also identifies periods of depressed mood. Ex. 6 at 5. These symptoms likely impact his ability to engage in social and sexual interactions with other adults. *Id*. at 8. He has developed a moral incongruence as

---

[10] D.L. Delmonico & J.A. Miller, The Internet sex screening test: A comparison of sexual compulsives versus non-sexual compulsives, 18 Sexual and Relationship Therapy 261 (2003).

[11] *Id.*

[12] Hanson R. K., Bussière M. T. (1998). *Predicting relapse: A meta-analysis of sexual offender recidivism studies*. JOURNAL OF CONSULTING AND CLINICAL PSYCHOLOGY, 63, 348–362.

he views many behaviors as immoral that society would deem moral. *Id*. Defendant is highly critical of his appearance, likely exacerbating his isolation and lack of social interaction. *Id*. Importantly, Defendant is identified as "needy for affection and acceptance." *Id*. This is highly concerning when considering his statements regarding feeling "comfortabl[e] in his interactions with children that he did not get when interacting with adults" and that he has "connected with children in a way that was validating." Ex. 6 at 2, 8. It appears as though Defendant relies on interactions with children as a means of coping, which suggests a greater risk of Defendant's seeking out such interactions, as they would satisfy his coping needs as well as his sexual interest.

Defendant's lack of a strong support system is also troubling in the context of Defendant's dangerous to the community and risk of reoffense. Individuals with mental health challenges see much better outcomes over time when there are strong support systems in place. Defendant reported that his father has been an alcoholic for as long as he can remember, denying aggression or abuse but noting a "challenging" relationship with his father. PSR ¶ 62; Ex. 6 at 4. Although Defendant reports an "amicable" relationship with his sister (PSR ¶ 62), his "very close relationship with his mother" seems to be his only meaningful support. PSR ¶ 62. He denied maintaining friendships after college and said that he drifted apart

from his wife during their marriage. Ex. 6 at 4. With such a minimal support system, Defendant presents a greater risk.

d. Challenges with treatment

Honesty is crucial in the context of sex offender treatment. Defendant can say he is amenable to treatment all day long, but until he is honest, treatment will have little impact. Defendant reported that he had an addiction to pornography in the past, but he denies a preoccupation with sex. Ex. 6 at 8. Defendant reported that he wants counseling, but he denies needing help to address his "sexual impulses and behavior." *Id*. at 9. The psychosexual assessment indicates Defendant was defensive, guarded, and did not fully disclose information throughout the test. *Id*. It further reports that Defendant does not have appropriate coping skills, lacks self-control, is "emotionally needy, feels unloved, and is inclined to continually seek for approval." *Id*.

In order for Defendant to learn how to control his deviant sexual behavior, he must understand his role in his crime to include that "he was the one that thought about, fantasized about and found a way to make the behavior happen." *Id*. Defendant's denial related to his own sexual interests, attempt to portray himself as asexual, trying to "look good" on the assessment, and "attempting to convince the evaluator that since he has little interest in sex, he has no sexual problems" does not illustrate an individual ready for behavior change. Ex. 6 at 6, 9. His disconnected

perception of the reality of the extreme and harmful nature of his conduct negatively impacts his likelihood of success.

Defendant's history and characteristics set him apart from other offenders who are before the Court for trafficking in child pornography. He is not, for example, the offender living in his mother's basement, simply downloading CSAM in bulk. Defendant has been unable to curb his appetite for CSAM, including sadistic material, for two decades. He needs validation from minor children in a way that increases his risk to the community. By engaging in an online forum of other offenders sharing his sexual interests, including individuals who have and were continuing to engage in hands-on sex abuse of minors, and even encouraging such abuse, Defendant normalized his deviant interests and behaviors, making it easier to justify his continued criminal conduct. Defendant's history and characteristics support the within-guideline sentence recommended by the United States.

3. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

Crimes involving the sexual exploitation of a minor child are among the most serious and reprehensible crimes that can be committed. "Those who traffic in child pornography, either by receiving or transporting the material, 'increase the market for child pornography and hence the demand for children to pose as models for

pornographic photographs ....'" *United States v. Barevich*, 445 F.3d 956, 958 (7th Cir. 2006) (quoting *United States v. Richardson,* 238 F.3d 837, 839 (7th Cir.2001).

For decades, Defendant was a consumer of images and videos of victims' worst possible moments in their lives. He took pleasure in their abuse and pain, without regard for the fact that such conduct was unlawful and certainly unjust for those victims. Not only did his consumption encourage the market for such degrading and dehumanizing content, but he directly encouraged other offenders to engage in hands-on sex abuse. A prison sentence of 210 months and a 10-year term of supervised release recognizes this, promotes respect for the law, and is just punishment.

4. <u>The need for the sentence imposed to afford adequate deterrence and to protect the public.</u>

A prison sentence of 210 months and 10 years of supervised release protects the public and serves the goal of general and specific deterrence. Young minor females, like Defendant's own daughters and their friends, are protected from Defendant's crimes while he is in custody. The period of supervision provides structure and monitoring necessary for sex offenders, in addition to treatment opportunities, which may assist Defendant in not acting on his sexual and impulsive interests in minors. Certainly the supervision gives the public some assurance that if Defendant does act on those desires, it will be detected sooner and thereby protect the community from additional harm.

5. The kinds of sentences available

Pursuant to the Rule 11(c)(1)(C) Plea Agreement, if accepted by the Court, the Court may sentence Defendant to a term of prison of not less than 60 months, up to 210 months, followed by a term of supervised release of not less than five years. ECF No. 60; PSR ¶ 78. Additional fines and special assessments apply.

6. The established sentencing range

Based upon a total offense level of 37 and a criminal history category of I, the advisory sentencing range is 210 – 262 months. PSR ¶ 79.

7. The need to avoid unwarranted sentence disparities

The Government's within-Guidelines recommended sentence does not create a sentencing disparity, much less an unwarranted one. *See Gall v. United States*, 552 U.S. 38, 54 (2007) (explaining that "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges"); *United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) ("The purpose of the sentencing guidelines is 'to eliminate disparities among sentences nationwide.'" (quoting *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008))).

8. The need to provide restitution to any victims of the offense

Both statute and the Rule 1(c)(1)(C) Plea Agreement require restitution be paid in an amount of not less than $3,000 per victim. We will never know the

identities of all of Defendant's victims. However, seven of Defendant's identified victims have requested restitution, in an amount that totals $44,000, as follows:

| Series/Victim Name | # Images/videos found in Defendant's collection | Amount Requested |
|---|---|---|
| Aprilblonde | 15 images<br>1 video | $10,000.00 |
| Best Necklace | 2 images | $10,000.00 |
| BluePillow1 | 12 images | $5,000.00 |
| Braid&Tile | 3 images<br>1 video | $3,000.00 |
| Dalmations | 6 images | $5,000.00 |
| Flower Lights | 1 image | $3,000.00 |
| Jan_Feb | 2 images | 00.00 |
| PurpleCheer | 1 video | $8,000.00 |

The number of files Defendant possessed of the aprilblonde and BluePillow1 victims suggests a preference for them and for the files depicting their abuse. As such, it is appropriate for the Court to order more than the minimum $3,000 restitution to those victims. Videos are counted as 75 images under the Guidelines, for good reason. Using that as a reference, Defendant possessed 90 times as many images of the aprilblonde victim and 12 times as many images of the BluePillow1 victim than that which is necessary to require a minimum order of $3,000.

B. Application of the Guidelines in Imposing a Sentence under 18 U.S.C. § 3553(b)

The Guidelines, formerly mandatory, now serve as one factor among several that courts must consider in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). It remains, however, that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id*. at 108-09 (internal quotation marks omitted). Thus, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id*. (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The government's recommended sentence is within the advisory guideline range. As noted herein, the PSR did not identify any grounds for departure.

**IV. $5,000 Special Assessment of the JVTA**

The United States seeks the imposition of a $5,000 special assessment pursuant to the Justice for Victims of Trafficking Act (JVTA). Assessments paid under the JVTA are deposited into the Domestic Trafficking Victims Fund for grants to enhance programs that assist trafficking victims and provide services for victims of child pornography.

Under the JVTA, the Court "shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under ... (3) chapter 110 (relating

to sexual exploitation and other abuse of children).” 18 U.S.C. § 3014(a)(3). In imposing a JVTA assessment, the non-indigency of a defendant is the governing deliberation and the statute does not require the court to consider the factors enumerated in 18 U.S.C. § 3572 with respect to the entry of a non-JVTA fine. *See generally* 18 U.S.C. § 3014 (no reference to or requirement upon the court to evaluate the 18 U.S.C. § 3572 factors when imposing a JVTA assessment).

Whether a defendant is non-indigent for the purposes of a JVTA assessment is determined not by a static snapshot of a defendant’s financial condition at the time of sentencing, but instead should be based on considerations of a defendant’s current and future financial condition.

> [A] district court must resolve two basic questions in assessing the defendant's indigency: (1) Is the defendant impoverished now; and (2) if so, does the defendant have the means to provide for himself so that he will not always be impoverished?
>
> …
>
> Because the defendant's obligation to pay persists for at least twenty years after his sentencing, it would make little sense for the district court to consider only the defendant's financial condition at the time of sentencing. That snapshot in time may not accurately represent the defendant's condition five, ten, or twenty years after sentencing. Rather, the defendant's employment prospects and earnings potential are probative of his ability to pay the assessment—and are fair game for the court to consider at sentencing.

*United States v. Shepherd*, 922 F.3d 753, 758 (6th Cir. 2019)

In this matter, Defendant agrees that he is non-indigent for the purposes of imposing a JVTA assessment. Although not singularly dispositive, the government first notes that Defendant's counsel is retained, not appointed. *See Shepherd*, 922 F.3d at 759 (fact that defendant is represented by appointed counsel is "probative but not dispositive" of indigence under § 3014, because indigence is not the standard for appointment of counsel).

Defendant will be able to participate in the Bureau of Prison's Inmate Financial Responsibility Program and pay $25 per quarter towards any outstanding monetary penalty. Additionally, Defendant has professional skills as an auditor and hopes to return to auditing upon his release. PSR ¶ 72. He also indicates that he will avail himself of job or trade programming while incarcerated. *Id*.

Rather than request a fine, the government respectfully requests the Court impose the mandatory JVTA special assessment.

## IV. $35,000 Special Assessment of the AVAA

In light of the restitution requests by the victims in this case, the United States recommends the imposition of only a $5,000 assessment pursuant to the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 (AVAA). Assessments paid under the AVAA are deposited into the Child Pornography Victims Reserve, which funds are available to victims in partial or full satisfaction of their restitution claims. 18 U.S.C. §§ 2259B(b), 2259(d). "It is the intent of

Congress that victims of child pornography be compensated for the harms resulting from every perpetrator who contributes to their anguish. Such an aggregate causation standard reflects the nature of child pornography and the unique ways that it actually harms victims." AVAA, PL 115-299, December 7, 2018, 132 Stat 4383.

Under the AVAA, the Court shall assess not more than $35,000 on any person convicted of receipt of child pornography. 18 U.S.C. § 2259A(a)(1). This assessment is "in addition to any other criminal penalty, restitution, or special assessment authorized by law." § 2259A(a). Imposition of an AVAA assessment "does not relieve a defendant of, or entitle a defendant to reduce the amount of, any other penalty by the amount of the assessment." 18 U.S.C. § 2259A(2).

In determining the amount of AVAA assessment to impose, the Court shall "consider the factors set forth in sections 3553(a) and 3572." 18 U.S.C. § 2259A(c). These factors include, in addition to the 3553(a) factors discussed above:

> (1) The defendant's income, earning capacity, and financial resources;
> (2) The burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially depending on the defendant, relative to the burden that alternative punishments would impose;
> (3) Any pecuniary loss inflicted upon others as a result of the offense;
> (4) Whether restitution is ordered or made and the amount of such restitution;

> (5) The need to deprive the defendant of illegally obtained gains from the offense;
> (6) The expected costs to the government of any imprisonment, supervised, release, or probation component of the sentence; [and]
> (7) Whether the defendant can pass on to consumers or other persons the expense of the fine.

18 U.S.C. § 3572(a).

Here, as discussed above, Defendant has the capacity for future earnings through participation in the Bureau of Prison's Inmate Financial Responsibility Program. He also has professional job skills and the opportunity to gain additional employment skills or learn a trade while in custody. There is nothing to suggest he will not be capable of some form of employment when released.

According to the terms of the Plea Agreement, all of Defendant's child pornography victims are entitled to restitution. ECF No. 61 at 16. Because we will never know the identities of all of Defendant's victims, and because even some of the identified victims forego seeking restitution on the drawn out, exhausting and sometimes traumatizing case-by-case basis, Defendant is not having to in fact pay restitution to all of his victims. This is a windfall for Defendant. The victims requesting restitution in this case are a fraction of the total number of victims harmed by Defendant's nearly two decades of downloading, viewing, sharing, and encouraging the further production of child pornography. It is appropriate that Defendant contribute to the AVAA fund benefiting victims premised on "aggregate

causation" of their "anguish." AVAA, PL 115-299, December 7, 2018, 132 Stat 4383.

If Defendant was subject to a greater restitution order, that would be a § 3572 factor weighing against imposition of an AVAA assessment. 18 U.S.C. § 3572(a)(4). Instead, however, the government is balancing its request of a $5,000 AVAA assessment with the present restitution request and imposition of the JVTA assessment. The government notes that $5,000 is less than the mandatory amount that must be ordered on behalf of only two victims. An award of $2,500 per victim covers a paltry amount of treatment hours for a victim of sexual exploitation; however, for victims in need, victims seeking help from the AVAA fund, that money can help facilitate healing.

Again, Defendant would be able to pay $25 per quarter through the IFRP during his period of incarceration towards any assessment. Even if no IFRP earnings are contributed, Defendant could make payments while on supervised release, without unreasonably burdening Defendant. If the Court imposes both an AVAA assessment and a JVTA assessment, Defendant's payments would go first to the AVAA assessment. 18 U.S.C. § 2259A(d)(2).

## CONCLUSION

Application of 18 U.S.C. § 3553 supports a sentence of imprisonment of 210 months in custody, to be followed by a ten-year term of Supervised Release, for

Defendant's commission of the crime of receipt of child pornography. The United States submits that such a sentence is sufficient, but not greater than necessary, to accomplish the goals of sentencing, and that a lesser sentence is not supported by application of the 18 U.S.C. § 3553(a) factors.

Respectfully submitted: September 25, 2026.

Todd Blanche
United States Attorney General

*s/ Ann T. Wick*
Ann T. Wick
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to defense counsel of record.

*s/ Ann T. Wick*
Ann T. Wick
Assistant United States Attorney